IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PAUL D. HEIMANN, individually,<br><br>Plaintiff,<br><br>vs.<br><br>ERICKSON & SEDERSTROM, P.C., L.L.O., and JOHN DOES 1-10,<br><br>Defendants. | **4:26CV3068**<br><br><br>**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER** |

This case is before the Court on Plaintiff's February 27, 2026, Ex Parte Motion for Temporary Restraining Order. Filing 2.[1] In his Motion, Plaintiff asserts that a Temporary Restraining Order (TRO) must issue *ex parte* "because [Defendant] can destroy critical electronic evidence within minutes of receiving notice of this action, and [Defendant] has already demonstrated a willingness to misrepresent material facts regarding the email account at issue." Filing 2 at 2 (unnumbered para.). Plaintiff seeks a temporary restraining order *inter alia* requiring Defendants "to immediately cease all interception, redirection, forwarding, copying, accessing, or reading of any electronic communications addressed to" Plaintiff's email address at the Defendant law firm where Plaintiff was formerly employed. Filing 2 at 10 (¶ 18.a.). For the reasons stated below, the Motion is denied.

## I. INTRODUCTION

In his Complaint, plaintiff Paul D. Heimann asserts claims of violation of the Electronic Communications Privacy Act of 1986 (ECPA), 18 U.S.C. §§ 2510-2523 and 2701-2713, and the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, against his former employer, Erickson

---

[1] The Motion also seeks a Preliminary Injunction, but the Court is concerned in this Order only with the Ex Parte Motion for Temporary Restraining Order.

& Sederstrom, P.C., L.L.O., (ES) and John Does 1 through 10. Filing 1 at 2 (¶ 1). He alleges that these claims arise from Defendants' unauthorized interception and redirection of electronic communications sent to Heiman's former email address at ES. Filing 1 at 2 (¶ 1). Heiman alleges that he was employed by ES for approximately 25 years, ending with his voluntary termination on December 30, 2024. Filing 1 at 3 (¶ 2), 5 (¶ 8). He alleges that in January 2025, he wrote ES requesting that ES either forward emails sent to his former email address with the firm to his new professional address or establish an auto-reply notifying senders that he no longer worked with the firm and providing his current contact information. Filing 1 at 5 (¶ 9). However, he asserts that ES refused his request and represented that the email account had been "completely shut down." Filing 1 at 5 (¶ 10).

Heiman alleges that over a year later in early February 2026, Mark Weber, Counsel for Discipline for the Nebraska Supreme Court, sent a communication intended for Heiman to his former email address at ES. Filing 2 at 3 (¶ 6). He alleges that Mr. Weber told him that his email was not rejected and that he did not receive any non-delivery notification, which Heiman alleges is an outcome that is inconsistent with a "completely shut down" account." Filing 2 at 3–4 (¶ 6). He alleges further that he and his wife[2] both sent "test emails" to his former email address at ES, and the delivery reports indicated that they were redirected to a "shadow mailbox." Filing 2 at 4–5 (¶¶ 7–10).

---

[2] In an email to the Court, Heiman brought to the undersigned's attention that Heiman's wife had been a law partner of the undersigned. The Court does not believe that a professional relationship in a large law firm that ended six years ago warrants recusal in this case. The undersigned is no longer recusing himself from all cases involving his former law firm.

2

## II. LEGAL ANALYSIS

### A. Standards for a TRO

Rule 65 of the Federal Rules of Civil Procedure provides, in pertinent part, "The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney." Fed. R. Civ. P. 65(b)(1). Rule 65(b) imposes significant requirements for a TRO issued without notice. Fed. R. Civ. P. 65(b)(1)–(3); *Tumey v. Mycroft AI, Inc*., 27 F.4th 657, 665 (8th Cir. 2022) (noting that there is a material difference between a TRO and a preliminary injunction in the allowed duration and the requirement of notice).[3] However, Rule 65(b) does not identify the standards that the Court must apply in deciding whether to grant a request for a TRO. *See generally* Fed. R. Civ. P. 65(b). The Eighth Circuit Court of Appeals has filled the gap by explaining, "A plaintiff seeking a preliminary injunction [or TRO] must establish [1] that he is likely to succeed

---

[3] Specifically, Federal Rule of Civil Procedure 65(b) provides as follows:

(b) Temporary Restraining Order.

(1) Issuing Without Notice. The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

(2) Contents; Expiration. Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry--not to exceed 14 days--that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

(3) Expediting the Preliminary-Injunction Hearing. If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character. At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order.

(4) Motion to Dissolve. On 2 days' notice to the party who obtained the order without notice --or on shorter notice set by the court--the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

Fed. R. Civ. P. 65(b).

on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Bio Gen LLC v. Sanders*, 142 F.4th 591, 600 (8th Cir. 2025) (bracketed numbers inserted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and also citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc))*; see also Schmitt v. Rebertus*, 148 F.4th 958, 966 (8th Cir. 2025) ("In deciding whether to grant preliminary injunctive relief, courts consider the four *Dataphase* factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties' litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." (quoting *Dataphase Sys., Inc.*, 640 F.2d at 114)).[4] No single factor is determinative or dispositive. *Schmitt*, 148 F.4th at 966. Thus, "the court should balance all the factors in considering whether the injunction should be granted." *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023).

The pertinent factors must be considered in the context of certain over-arching principles. First, "[a] preliminary injunction [or TRO] is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Second, because a TRO or preliminary injunction is an extraordinary remedy, "the party seeking a preliminary injunction bears the burden of establishing the necessity of the remedy." *Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023) (citing *Gen. Motors*

---

[4] Courts in this Circuit have for decades called the considerations for determining whether to grant a TRO or a preliminary injunction the "*Dataphase* factors," set out in *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc). The much more recent statements of the pertinent factors by the Supreme Court in *Winter*, as quoted in *Bio Gen*, while identifying the same considerations, give them sufficiently different definition to warrant reference to the "*Winter* factors" rather than the "*Dataphase* factors." *Compare Winter*, 555 U.S. at 20 (as quoted in *Bio Gen*, 142 F.4th at 600, in the body of this decision), with *Dataphase*, 640 F.2d at 114 (as quoted in *Schmitt*, 148 F.4th at 966, as set out in the body of this decision). However, even since *Winter*, the Eighth Circuit Court of Appeals has generally persisted in relying on the pertinent factors as the "*Dataphase* factors." *See, e.g.*, *Schmitt*, 148 F.4th at 964; *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023); *but see Cigna Corp. v. Bricker, 103 F.4th 1336, 1342–1343 (8th Cir. 2024)* (quoting the factors from *Winter*, 555 U.S. at 20, then citing *Dataphase Sys.*, 640 F.2d at 114, for the "same factors," and referring to the "*Winter/Dataphase* factors").

*Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009)), *cert. denied*, 144 S. Ct. 1350 (2024). Third, the "primary function" of a TRO or preliminary injunction "is to preserve the status quo until a court may grant full relief upon a final hearing." *Wilbur-Ellis Co., LLC v. Jens*, 139 F.4th 608, 611 (8th Cir. 2025). To put it another way, the purpose of preliminary injunctive relief "is not to give the movant the ultimate relief he seeks." *Lindell*, 82 F.4th at 618. Indeed, "[r]equiring [the defendant] to take affirmative action . . . before th[e] issue has been decided on the merits goes beyond the purpose of a preliminary injunction." *Tumey*, 27 F.4th at 665 (quoting *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co*., 997 F.2d 484, 490 (8th Cir. 1993)).

The Court turns to consideration of the *Winter/Dataphase* factors in this case in the context of these guiding principles.

## B.  The Dispositive Factors

The two most critical *Winter/Dataphase* factors are the likelihood of success on the merits and irreparable harm. *See Schmitt*, 148 F.4th at 966 ("While no single [*Dataphase*] factor is determinative, the probability of success factor is the most significant." (quoting *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013)); *Denali Summit, LLC v. Union Elec. Co*., 158 F.4th 896, 899 (8th Cir. 2025) ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." (quoting *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). Heiman cannot satisfy either of these key factors.

### 1.  Likelihood of Success

As to likelihood of success on the merits, the Eighth Circuit has explained,

> [The movant] "must demonstrate that [he] has a 'fair chance' of prevailing on the merits." *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). "To show a fair chance of prevailing, [the movant] must show that [his] claims provide fair ground for litigation, but [he] need not show that [he] has a greater than fifty per cent likelihood of success." *Id*. at 1016–17 (internal quotation marks and citations omitted).

5

*Schmitt,* 148 F.4th at 966 (second and fourth alterations by this Court).

Heiman's argument for his likelihood of success on the merits of his Stored Communications Act claim is that the delivery reports establish that ES's email system is redirecting his emails to a different recipient and that ES is obtaining communications intended for him while preventing his authorized access to them. Filing 2 at 8 (¶ 14). He asserts that because ES represented that the account was "completely shut down," he had no reason to suspect such interception and redirection. Filing 2 at 8 (¶ 14). His argument for his likelihood of success on his Federal Wiretap Act claim is that ES has configured its email system to capture and redirect his email, but the "one-party consent" exception does not apply because ES was not a party to the intercepted communications and the interception furthered tortious conduct. Filing 2 at 8–9 (¶ 15). His argument for likelihood of success on his Computer Fraud and Abuse Act is that the person receiving his redirected communications is reading attorney-client privileged information without authorization on a computer used in interstate commerce. Filing 2 at 9 (¶ 16).

Yet, all of these arguments are premised on Heiman's allegations that ES is capturing and using emails sent to him. He alleges that Mr. Weber told him that his email was not rejected and that he did not receive any non-delivery notification, which Heiman alleges is an outcome that is inconsistent with a "completely shut down" account." Filing 2 at 3–4 (¶ 6). However, Heiman's information about Mr. Weber's attempt to email him is based entirely on hearsay. Heiman alleges further that he and his wife both sent "test emails" to his former email address at ES, and the delivery reports indicated that they were being redirected to a "shadow mailbox." Filing 2 at 4–5 (¶¶ 7–10). These limited factual allegations are then used to reach highly speculative conclusions that the emails have not just been forwarded to a "dead emails" inbox, but opened, read, and used without authorization.

The Court is hesitant to pass judgment on what is and is not allowed with regard to a firm domain e-mail address without a thorough legal review. Indeed, legal authority suggests an employer's domain e-mail address is owned by the employer, not the employee, and the employer retains authority to review emails sent to the company-owned email address. *See, e.g.*, *Rissetto v. Clinton Essex Warren Washington Bd. of Coop. Educ. Servs*., No. 8:15-CV-720 (CFH), 2018 WL 3579862, at *6 (N.D.N.Y. July 25, 2018) ("Where an employer reserves the right to access or inspect an employee's email or work computer, courts often find that the employee has no reasonable expectation of privacy." (citations omitted)); *Owen v. Cigna*, 188 F. Supp. 3d 790, 793 (N.D. Ill. 2016) (employer's accessing of former employee's email on her employer-owned work computer did not violate the CFAA); *United States v. Elmquist*, No. 07-00245-01-CR-W-ODS, 2008 WL 3895971, at *11 (W.D. Mo. Aug. 18, 2008) (where an employer's policy stated that all messages distributed via the company's email system remained the company's property, the employee had no reasonable expectation of privacy in the email or computer); *Soft-Aid, Inc. v. Sam-on-Demand*, No. CV 14-10419-LTS, 2016 WL 10919656, at *16 (D. Mass. Aug. 11, 2016) ("[T]he Court is not aware, of any cases holding that a company is not authorized to review emails sent to a company created and owned email address and stored on the company's server."). That being said, there is at least some authority out there that a law firm has obligations to inform those contacting an attorney's former firm address that the lawyer no longer works at the firm. *See, e.g.*, ABA Formal Opinion No. 99-414 (Sept. 8, 1999) ("The departing lawyer and responsible members of the law firm who remain have an ethical obligation to assure that prompt notice is given to clients on whose active matters she currently is working."). These legal authorities, on which the Court will reserve its ruling until such issues are fully briefed by the parties, call into question whether Heiman has a likelihood of success.

However, even if Heiman were to establish that opening, reading, and using e-mails to Heiman's former firm domain e-mail address is illegal or unethical, the Court finds the conclusion that the firm is engaging in such conduct implausible given the evidence submitted. The Court finds it unlikely that a law firm would purposely engage in conduct contrary to law and its professional obligations and run the risk of serious criminal, civil, or disciplinary consequences for so little gain. The Court likewise concludes under the facts presented that a temporary restraining order is not necessary to make sure Erickson Sederstrom preserves evidence regarding a now pending federal lawsuit.

This factor does not weigh sufficiently in Heiman's favor to merit a TRO, especially not one requested *ex parte*.

### 2. *Irreparable Harm*

As to irreparable harm, the Eighth Circuit has explained,

> "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). Even where a permanent injunction may be appropriate relief after a final decision on the merits, preliminary injunctive relief is not necessarily warranted if any interim harm can be remedied in a final judgment. *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (per curiam). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

*Denali Summit, LLC*, 158 F.4th at 899. The Eighth Circuit has also stated, "A party is not required to prove with certainty the threat of irreparable harm, but it must prove that irreparable harm is likely in the absence of an injunction." *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 927–28 (8th Cir. 2025) (cleaned up) (quoting *Sleep No. Corp.*, 33 F.4th at 1018, in turn quoting *Winter*, 555 U.S. at 22).

The Court first notes that the problem with Heiman's showing on this factor is not that he has failed to identify any irreparable harms. Those alleged harms are ongoing statutory violations of the Wiretap Act and the Stored Communications Act; the compromise of attorney-client privileged information; destruction of evidence; and loss of client relationships. Filing 2 at 5–7 (¶ 12). Rather, the critical flaw as to this factor is the lack of admissible evidence to support a showing of irreparable harm. The allegations of irreparable harm in the Complaint and the Motion are unsupported by any factual allegations that make the anticipated harms plausible rather than conclusory and speculative. The harms alleged are not plausible for essentially the same reasons that success on the underlying claims is unlikely. Moreover, Heiman has not offered a single allegation that any client has complained of disclosure of attorney-client privileged information or an allegation of loss of a client relationship, and his allegation of destruction of evidence and electronic records is speculative at best.

Thus, Heiman has not pointed to evidence demonstrating irreparable harm showing "a clear and present need for equitable relief" or demonstrating that "irreparable harm is likely in the absence of an injunction." *Iowa Migrant Movement for Just.*, 157 F.4th at 927–28 (internal quotation marks omitted). Thus, this key factor also weighs against a TRO, particularly an *ex parte* one.

### 3. Another Pertinent Factor

Both the United States Supreme Court and the Eighth Circuit Court of Appeals have recognized the importance of diligence in seeking injunctive relief. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018); *Ng*, 64 F.4th at 997 (explaining that unreasonable delay "is a sufficient basis to deny" a preliminary injunction); *see also Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 894 (8th Cir. 2024) (citing *Benisek* and *Ng*). The Court simply does not find it plausible that

Heiman had no reason to discover the alleged interception of his emails directed to his address with his former employer for thirteen months after leaving his prior employment. Reasonable contacts with clients in the months between his voluntary termination at the end of 2024 and his alleged contact with Mr. Weber in February 2026 should have alerted him that former clients were not getting responses to emails they were sending to him at his former email address and they were not getting delivery failure notifications.

The implausible suggestion that Heiman had no reason to discover the improper capture of his emails also weighs against a TRO.

### III. CONCLUSION

Because the factors discussed weigh against a TRO, and the remaining factors are of less importance, the Court need not consider those remaining factors because they do not change the balance. Because a TRO or preliminary injunction is an extraordinary remedy, "the party seeking a preliminary injunction bears the burden of establishing the necessity of the remedy." *Lindell*, 82 F.4th at 618 (citing *Gen. Motors Corp.,* 563 F.3d at 316). Heiman has not carried that burden here to obtain such extraordinary relief. Accordingly,

Upon the foregoing,

IT IS ORDERED that on Plaintiff's February 27, 2026, Ex Parte Motion for Temporary Restraining Order, Filing 2, is denied. The Court will set a briefing schedule on Plaintiff's Motion for Preliminary Injunction after the named Defendant has been served and appeared in the case.

Dated this 2nd day of March, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge